**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-586 (RC)** |
| **v.** | : | |
| | : | |
| **FRANCIS CONNOR,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Francis Connor to 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

I.    **Introduction**

Defendant Francis Connor, a 23-year-old warehouse worker from Brooklyn, New York, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

Connor pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration followed by probation is appropriate in this case because

---

[1] Although the Statement of Offense in this matter, filed on April 28, 2022, (ECF No. 32 at ¶6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

(1)  Connor engaged in planning and coordination to participate in the riot with his friends and co-defendants, Anton Lunyk and Antonio Ferrigno, (2) in social media messages before the riot, Connor expressed his intent to engage in "civil war" and willingness to commit physical violence against his perceived political enemies, (3) while inside the Capitol Building on January 6, Connor entered Senator Jeff Merkley's Office, a sensitive space, (4) in social media messages after the riot, Connor expressed pride and enthusiasm for the riot and his participation in it, and (5) after the riot, Connor deleted evidence of his participation in the riot from his cellular phone.

The Court must also consider that Connor's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). Connor's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Connor's crime support a sentence of 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 41 (Statement of Offense), at 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Connor's conduct and behavior on January 6.

### *Defendant Connor's Role in the January 6, 2021, Attack on the Capitol*

Late in the night on January 5, 2021, Francis Connor and co-defendants Anton Lunyk and Antonio Ferrigno drove from their homes in Brooklyn, New York, to Washington, D.C.  The three friends planned to attend the former President's "Stop the Steal" rally and coordinated their trip via Instagram Messenger.

Once in D.C., Lunyk, Connor, and Ferrigno did attend the "Stop the Steal" rally.  They were admitted to the cordoned off area on the Ellipse, where they listened to speeches by the former president and others.  Later, they headed together towards the Capitol Building.

Lunyk, Connor, and Ferrigno approached the Capitol Building from the West.  At the time of their arrival on the grounds, the riot was well underway.  Hundreds of rioters were engaged in hand-to-hand combat with police in the Lower West Plaza.  With the police distracted, thousands of rioters had already been able to stream into the Capitol Building.  Lunyk, Connor, and Ferrigno joined them.

Lunyk, Connor, Ferrigno entered the Capitol Building through the Senate Wing Door on the West Side of the Building at approximately 3:08 p.m., almost an hour after the first breach of the building at that Door.  Yet, the lobby inside the Senate Wing Door was still packed with rioters.

In fact, about 20 minutes before Lunyk, Connor, and Ferrigno's entry, Capitol Police managed to clear the lobby and barricade the Senate Wing Door from the inside, but a wave of rioters breached the Door a second time around 2:47 p.m.

As they crossed the threshold into the Capitol Building, all three defendants held up their cell phones as if recording.



*Exhibit 1 – Screenshot of CCTV showing defendants' entry into the Capitol Building at approximately 3:08 p.m. Defendants Ferrigno, Connor, and Lunyk (left to right) are highlighted by red circles.*

The defendants then entered the workspace of Senator Jeff Merkley, the entrance to which is directly next to the Senate Wing Door Lobby. As they entered, they were captured on a livestream recorded by rioter and social media personality Tim Gionet, a.k.a. "Baked Alaska."[2] Lunyk and Ferrigno are visible laughing and recording on their cell phones in the background as Baked Alaska fakes a phone call to the Senate from the landline in Senator Merkley's Office. A

---

[2]     Baked Alaska's livestream has been submitted to the Court as an exhibit and marked as Exhibit 2.

screenshot of the livestream showing Lunyk in the background surfaced on the internet shortly

after the riot, leading to Lunyk's early identification and, later, his arrest.



*Screenshot from Exhibit 2 (Baked Alaska's livestream) at marker 18:04. Defendants Lunyk and Ferrigno (left to right) are circled in red in the background as Gionet fakes a phone call to the Senate.*

While in Senator Merkely's Office, Connor poked through books and papers. In videos recorded

by rioters in the workspace, rioters can be seen with their feet up on the desk, and one rioter appears

to have removed a framed picture from the wall and is visible in a video carrying the frame. After

the riot, Senator Merkley posted a video of the damage to his workspace.[3] Despite the Senator

having left the door unlocked, rioters had torn the door to the workspace off the hinges. Personal

mementos had been torn from the walls and strewn about. A laptop was stolen. Debris, including

cigarette butts, littered the floor.

---

[3]       Senator Merkley's video has been submitted to this Court as an exhibit and marked Exhibit 3.

After leaving Senator Merkley's workspace, the defendants next traveled to the Capitol Crypt, where they posed for a photo.



*Exhibit 4 – Defendants Connor, Ferrigno, and Lunyk (left to right) posing in the Capitol Crypt.*

The defendants continued from the Crypt to the House side of the Capitol, still on the first floor. They turned around in the House wing and went back the way they came.

The defendants exited the Capitol Building at approximately 3:18 p.m. by climbing out a broken window next to the Senate Wing Door (the door they entered) while alarms blared overhead.[4]

---

[4]    A video recorded by Ferrigno on his cell phone of Connor climbing out the window has been submitted to the Court as an exhibit and marked Exhibit 5.



*Screenshot from Exhibit 5 (Ferrigno cell phone video) – Connor climbing out the window next to the Senate Wing Door at approximately 3:18 p.m.*

In total, the defendants spent about 10 minutes crisscrossing the first floor of the Capitol. Their approximate path is shown on the map below.



*Exhibit 6 – Map of the first floor of the Capitol Building. The defendants' approximate path is indicated by red arrows.*

After the riot, unlike his co-defendants, Connor appears to have deleted every photograph, video, text message, Instagram message, or other in-app message relating to events or actions taken prior to, during, or after January 6, 2021.  CCTV clearly shows Connor taking photos and recording video while inside the Capitol on January 6, and his co-defendants phones both contained multimedia relating to the events of January 6, including messages and photos shared with Connor.

*Lunyk, Connor, and Ferrigno's Instagram Messages*

Messages that Lunyk, Connor, and Ferrigno exchanged amongst themselves and others on Instagram Messenger,[5] from Election Day, 2020, and onward, demonstrate the depth of their beliefs that the 2020 Election had been stolen from the former President, their support for "Stop the Steal," and the lengths to which they were willing to go to fight for the election results to be overturned.  The messages show that the defendants were motivated to "fight" for the former president, and that the former president told them to fight.  The messages show prior planning and coordination between the three co-defendants and others to go to the Stop the Steal rally on January 6, 2021, as early as November of 2020.

The messages show that at least Lunyk and Connor traveled to Washington D.C. for another rally on November 14, 2020 ("The Million MAGA March"), and their interest in traveling to Washington D.C. and elsewhere in the country (e.g., the Georgia State Capitol in Atlanta, Georgia) for other rallies.

---

[5]     Relevant messages sent by the three co-defendants are attached to this memorandum as an appendix.  The messages are organized by "thread" – messages in the same "thread" are messages from a single, ongoing conversation between a generally stable group of Instagram users.  As can be seen in the appendix, the three co-defendants participated in multiple threads, some including all three of them, some including two of them, and some involving only one of them.  Messages included in the appendix are not comprehensive – i.e., not every message that the co-defendants sent in each thread are included, and messages sent in the thread by users that are not the three co-defendants are not included, except where necessary for context.

The messages demonstrate the defendants' interest in organized groups such as the Proud Boys and the Oath Keepers.  The messages also indicate the extent of the defendants' beliefs in conspiracy theories beyond the 2020 Election being fraudulent, such as Q Anon.  Q Anon is not an organized group but an online conspiracy theory that motivated many to attack the Capitol on January 6, 2021, due to beliefs that, for example, Joe Biden and Democrats are pedophiles.

The messages reflect that, while the defendants were worried about being arrested after the riot, they were exuberant about having participated.  Lunyk said the next day in a thread that included Connor and Ferrigno, "LMAO bro this shit was wild."

Lunyk in particular, in threads involving Ferrigno and Connor, repeatedly told others that the police had let them into the Building and "guided [them] throughout."  Ferrigno chimed in, saying, "The cops outright gave us a tour."  This is not borne out by CCTV.  When the defendants entered the Senate Wing Door Lobby, it was packed with rioters preventing police from securing the area.  There were no police near the door.  And, while the defendants walked past police passively standing guard in the House Wing, in no way were the police "giving a tour" or guiding the defendants anywhere inside the Capitol Building.



*Exhibit 7 – Screenshot of CCTV showing defendants walking in the House Wing while police monitor the hallway in the background*

*The Charges and Plea Agreement*

On August 31, 2021, Connor was arrested on a criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).  On September 17, 2021, the United States charged Connor by four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).  On April 28, 2022, pursuant to a plea agreement, Connor pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Connor agreed to pay $500 in restitution to the Architect of the Capitol.

## III.      Statutory Penalties

Connor now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Connor faces up to six months of imprisonment and a fine of up to $5,000. Connor must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79

(D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices.  Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while assessing Connor's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Connor personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on Connor's part is therefore not a mitigating factor in misdemeanor cases.

Relative to some, Lunyk, Connor, and Ferrigno spent limited time inside the Capitol Building – 10 minutes.  However, they arrived on Capitol Grounds and entered the Building well after the riot was underway, which meant that they had ample signals that they should turn around and leave.  They would have seen and heard the violence between police and rioters in the West Plaza.  They would have seen and likely been subjected to crowd-dispersal ordinance.  But they did not leave.  Instead, they entered the Capitol Building, snapped photos and videos, climbed through broken windows, and entered what was clearly a private office—Senator Merkley's workspace—and remained there while rioters ransacked the space.  Connor went the extra step, poking around in the Senator's books and papers.

While the defendants should have appreciated the signs of trouble and turned around, their entry into the Capitol amidst the chaos of the riot is not surprising. They came to Washington D.C. *for* the chaos, as their messages before the riot make clear. Connor, in particular, was spoiling for a fight. Ahead of the November 14 rally, Connor told Instagram users that he was going to D.C. to start a "massive conflict" and "WAR IN DC." His fervor did not wane even after the riot on January 6. On January 6, Connor messaged friends on Instagram: "I was in the Capitol… I don't play… fuck these cunts… I'm in the middle of a civil war." On January 7, in a different thread, he said, "I want Civil War… Fuck this sick of everyone hating Trump… civil war needed or we done."

The defendants believed that the 2020 election was stolen and fraudulent, and went to Washington D.C. in January 2021 with the desire to prevent President Biden from being inaugurated, as is clear from the following messages:

| 2020-11-04 | Connor | T17:16:13Z | theyre tryna steal this thing so hard |
|---|---|---|---|
| 2020-11-04 | Lunyk | T17:48:27Z | what I see in front of me is a brainless pedophile puppet who will step down if he wins and allow the racially confused horse face bitch to run us into the ground and continue selling us out to china... which evidently will turn america into a socialist third world country and allow china to become the number 1 superpower, all so the dem elitists can make a few billion and maintain power and continue to sexually abuse children on yet another island |
| 2020-11-05 | Connor | T17:14:00Z | Bro that's literally illegal |
| 2020-11-05 | Connor | T17:14:08Z | trump is getting re-elected |
| 2020-11-06 | Ferrigno | T16:58:32Z | None of us will be alright under Biden |
| 2020-11-07 | Ferrigno | T18:29:52Z | The dead Americans voted |
| 2020-11-09 | Ferrigno | T18:45:33Z | We better eliminate the Democratic Party after this |
| 2020-11-16 | Ferrigno | T18:22:48Z | STOP THE STEAL |
| 2020-11-20 | Connor | T16:28:52Z | I will see you in DC on the 20th of the first month of the year 2021. Until then dint even contact me |
| 2020-12-08 | Lunyk | T02:22:38Z | Biden can't get inaugurated bro it just cannot happen |
| 2020-12-15 | Lunyk | T01:45:56Z | Btw electoral colleges final vote is on January 6th... so idk where "world star" is getting these "reports" |

13

| 2021-01-12 | Connor | T20:31:49Z | I'll do time for Donald |
| 2021-01-12 | Connor | T20:41:19Z | They stole the election and that's that |
| 2021-01-12 | Connor | T20:49:16Z | Come lock me up there's nothing to live for if trump isn't in office |

The defendants, Connor in particular, were willing to use or were at least extremely tolerant

of violence against their perceived political enemies and to accomplish their political goals:

| 2020-11-03 | Connor | T19:55:58Z | Preparing for war |
| 2020-11-03 | Ferrigno | T19:56:45Z | I say fuck it let's go looting either way |
| 2020-11-03 | Ferrigno | T19:57:02Z | Let's do it I'll drive a forklift into the store |
| 2020-11-03 | Lunyk | T22:53:17Z | kill them with the liberals |
| 2020-11-03 | Ferrigno | T22:54:37Z | This is why everyone should carry chloroform |
| 2020-11-05 | Connor | T03:21:01Z | Can't wait to die when earth explodes |
| 2020-11-05 | Connor | T03:26:12Z | Hopefully civil war comes |
| 2020-11-07 | Connor | T02:20:33Z | Donald will president come January 20 |
| 2020-11-07 | Connor | T18:47:19Z | bro Biden not gonna be president |
| 2020-11-07 | Connor | T18:47:21Z | Civil war time |
| 2020-11-09 | Connor | T19:16:25Z | Hope the military just starts shooting people |
| 2020-11-09 | Connor | T19:23:09Z | Let it burn |
| 2020-11-09 | Connor | T20:19:44Z | I hope NYC gets nuked and we all die |
| 2020-11-09 | Connor | T20:23:56Z | I want civil war |
| 2020-11-09 | Connor | T20:26:51Z | WE ARE REVERSING THIS DAMN ELECTIOM |
| 2020-11-09 | Connor | T20:28:03Z | yeah now it's civil war |
| 2020-11-09 | Connor | T20:28:14Z | Guys wanna know what trumps next move should be |
| 2020-11-09 | Connor | T20:28:22Z | literally I would advise him to do this |
| 2020-11-09 | Connor | T20:28:24Z | Next weekend |
| 2020-11-09 | Connor | T20:28:28Z | Rally in NYC |
| 2020-11-09 | Connor | T20:28:34Z | start a massive conflict |
| 2020-11-10 | Connor | T04:28:49Z | he will be in DC on Saturday |
| 2020-11-10 | Connor | T04:28:53Z | I think we r all going |
| 2020-11-10 | Connor | T04:30:04Z | Gonna cause a massive conflict |
| 2020-11-10 | Connor | T18:42:24Z | WAR IN DC |
| 2020-11-14 | Connor | T21:05:53Z | It's civil war over here |
| 2020-11-25 | Connor | T15:35:42Z | Let's murder Cuomo |
| 2020-11-25 | Connor | T15:37:23Z | I'm gonna have to take control of this country |
| 2021-01-08 | Connor | 00:36:11Z | We raped AOC |
| 2021-01-08 | Connor | 00:56:33Z | I would've said "Our job yesterday wasn't completed. Our end goal was to brutally murder Pence and Pelosi, and sadly today they're still breathing, therefore we must come back stronger and fiercely next time around" |
| 2021-01-08 | Lunyk | T01:43:33Z | Civil war man |

| 2021-01-12 | Ferrigno | T02:06:01Z | I will fight for merica |
| 2021-01-12 | Ferrigno | T02:06:06Z | I will risk my life for merica |
| 2021-01-12 | Lunyk | T20:46:11Z | If they take my money I'm gonna shoot pelosi |
| 2021-01-21 | Ferrigno | T18:52:38Z | TRUMP WILL GO DOWN IN HISTORY AS GREATEST PRESIDENT EVER ONCE EVERYONE SEES WHAT THIS COUNTRY TURNS INTO UNDER CORRUPT POLITICIANS |
| 2021-03-12 | Lunyk | T16:04:25Z | The only answer is murder the left |

These messages were sent privately rather than posted publicly, which distinguishes Lunyk, Connor, and Ferrigno from other misdemeanor defendants who have been given weightier sentences for their aggravating use of social media. But the brazenness of the defendants' entry into the Capitol following their well-laid plans to travel to Washington D.C., for the purpose of creating mayhem, if not actually overturning the election, is highly aggravating.

Finally, Connor, in contrast to his co-defendants, appears to have deleted all evidence of his participation in the riot from his phone. The government does not have direct evidence of Connor's willful destruction of evidence, but given that Connor entirely cleared his phone of material related to January 6 when it certainly was once there, the inference that he purposefully deleted this material to hide his participation is fair. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration followed by probation in this matter.

### B. Connor's History and Characteristics

Connor is 23 years old and lives with his parents in Brooklyn, New York. He is employed at an Amazon warehouse. He has no criminal history. He is not married and has no children. He has been compliant with his conditions of release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### *General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

---

[6]    Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Connor's case presents an extremely strong need for specific deterrence. Connor and his co-defendants' messages before and after the riot indicate a plan to do what they did on January 6, 2021, and a willingness to do it again. Of the three co-defendants, Connor's messages are

especially troubling. Throughout his messages, in multiple chats with different people, Connor mentioned being involved in, hoping to be involved in, or predicting "civil war" in 14 separate messages in multiple different threads.

He also discussed his desire to start a "conflict." For example, Connor stated on November 9, 2020, that he would advise President Trump to hold a rally in New York City for the purpose of starting "a massive conflict." Connor stated on November 10, 2020, that he was "[g]onna cause a massive conflict" when he went to D.C. for the November 14 rally. In a separate instance, Connor asked a friend where he could obtain a gun so he could "air out a whole block," and emphasized, "I'm serious bro lol." In context, it is clear that Connor's use of the word "conflict" means that he wanted to light the match that would ignite the flame of civil war.

These statements speak to Connor's desire to engage in and initiate political violence at any opportunity. Connor will likely argue that these statements are mere puffery, boys being boys. Even taking that argument on its face, Connor's statements reflect an appalling indifference toward extreme violence, if not a disturbing expression of his actual intent to engage in political violence. Moreover, it is clear from his real-life attendance at political rallies that Connor deliberately places himself in the midst of violence, even if he has not committed violence himself. At best, the line between Connor's rhetoric and what he is willing to act on is very blurry. Specific deterrence, as well as the safety of the community, demands a meaningful sentence in Connor's case.

Finally, when considering specific deterrence, the government has encouraged judges in this district to take into account a defendant's remorse or contrition following the riot. But the government submits that contrition should be credited with caution when it is expressed for the first time at sentencing, especially if that remorse is belied by strong statements of enthusiasm or pride immediately following the riot. While the government encourages contrition and believes it

to be an important piece of accountability, some January 6 defendants have expressed remorse at their sentencings only to turn around and recant that remorse, even seeking to profit from their prosecution. *See United States v. Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions."); *see also United States v. Derrick Evans*, 1:21-cr-337 (RCL), ECF No. 52, "Notice of Defendant's Post-Sentencing Statements" (06/30/2022).

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7]  This Court must sentence Connor based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.  Although those like Connor convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not be the default.[8]  *See United States v. Anna*

---

[7]       Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8]       Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Connor has pleaded guilty to Count 4 of the Information, charging him parading, picketing, or demonstrating in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

Comparing Connor to misdemeanor defendants previously sentenced in Capitol Riot cases is difficult given the gap between the violence of Connor's rhetoric and his actions inside the Capitol on January 6, 2021, which were thankfully much more benign. But the extent and extremity of the defendants' violent rhetoric before and after the riot, which clearly reflects their motivation and intent to engage in the charged criminal conduct, distinguishes them from other Capitol Riot defendants who have pled guilty to 40 U.S.C. § 5104(e)(2)(G). And, in general, no previously sentenced case contains the same balance of aggravating and mitigating factors present here, but the sentences in the cases discussed below provide suitable comparisons to the relevant sentencing considerations in this case.

Previously sentenced cases involving defendants who entered Senator Merkley's workspace provide helpful comparisons to Lunyk's case. In the case of Carson Lucard, 22-cr-87, and Brian Stenz, 21-cr-671, Chief Judge Howell sentenced Lucard to 21 days of intermittent confinement and 36 months' probation and sentenced Stenz to 14 days' incarceration as a condition of probation. Both defendants entered Senator Merkley's workspace and Stenz took pictures of the damage to the office. Chief Judge Howell emphasized at the sentencing that, even if the defendants didn't directly participate in ransacking the officer, their presence there facilitated the destruction. Lucard received a higher sentence than Stenz because Carson entered the Capitol Building twice, the second time encouraging Stenz to come in with him.

In the case of Janet Buhler, 21-cr-510, Judge Kollar-Kotelly accepted the government's recommended incarceration sentence of 30 days. Buhler enthusiastically entered the Capitol Building after ignoring multiple red flags including flash bangs, plumes of smoke in the air, and rioters scaling the walls of the Capitol Building. She cheered as rioters physically crushed Capitol Police at the East Rotunda Doors. She entered Senator Merkley's workspace, which Judge Kollar-Kotelly considered a serious aggravating factor. She also deleted photographs documenting her entry into the Capitol Building from her phone.

Judge Kollar-Kotelly also imposed 30 days in the case of Oliver Sarko, 21-cr-594. As Chief Judge Howell found in the Stenz/Lucard cases, Judge Kollar-Kotelly found Sarko's mere presence inside Senator Merkely's workspace aggravating.

Further, Judges have imposed incarceration in cases where the defendant engaged in destruction of evidence. *See, e.g., United States v. Paul Westover*, 1:21-CR-00697 (imposing 45 days' incarceration where, among other things, defendant destroyed evidence by deleting photos and videos recorded on January 6 from his Facebook account and cell phone); *United States v.*

*Jeremy Sorvisto*, 1:21-CR-00320 (imposing 30 days' jail time where, among other things, defendant was among the first in the Capitol and stayed for about 25 minutes, and after the fact destroyed evidence and expressed no remorse).

This Court should also consider the sentences it will impose on the three co-defendants compared to each other. The three co-defendant's aggravating conduct is mostly identical, with some important variations. The government is recommending a higher sentence for Connor due to his relatively more violent rhetoric—specifically, his clear intent before and after the riot to engage in "conflict" and "civil war" and to obtain a weapon so that he could "air out a whole block," which demands specific deterrence—and the fact that he deleted evidence of his participation in the riot from his phone. The 30 days that the government has recommended for Ferrigno is in line with other Capitol Riot defendants who entered Senator Merkely's workspace and had additional aggravating factors including posting on social media, deleting evidence, entering the Capitol twice, and cheering on violence. Here, Ferrigno and his co-defendants' aggravating factors include their extensive pre-planning and clear intent to engage in mayhem. The government would have also recommended a 30-day sentence for Lunyk but for his assistance as a witness in an unrelated federal investigation. As a credit for his assistance, the government has reduced its recommendation as to Lunyk to 20 days.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### F.  The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-

00356 (EGS), ECF 38 (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[9] In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § § 3563(b)(10).

## 1.    A sentence imposed for a petty offense may include both incarceration and probation.

*Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[10] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be

---

[9]    In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

[10]    A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[11]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing

---

[11]    Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

*Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172

F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th

ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided

sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might

be thought to prevail." *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or

31

probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Connor pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

2.    **A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

*Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.  Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[12]

*Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862,

at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

and reversing magistrate's sentence that included 30-day period of confinement as a condition of

probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18,

2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation

was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous

60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of

up to two weeks' imprisonment served in one continuous term followed by a period of probation

is permissible under Section 3563(b)(10).[13]

---

[12]     Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation
was "not intended to carry forward the split sentence provided in Section 3561, by which the judge
imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL
25404, at *98.

[13]     Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time"
does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the
singular include and apply to several persons, parties, or things," "words importing the plural
include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Francis Connor to 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    /s/
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048